Please be seated. The court will call the first case. Good morning, everyone. Welcome to the Illinois Appellate Court, First District, First Division. We'll ask that the lawyers who are going to argue step up at this time, introduce themselves, and tell us whom you represent. Good morning, Your Honors. My name is Caroline Borland, and I represent the appellant, Carlos Hensley. Good morning, Your Honors. John Walters, representing the people of the state of Illinois. All right. Thank you, Counsel. Under Illinois Supreme Court Rule 352B, each side has 20 minutes for the main argument, and the appellant has 10 minutes for rebuttal. We may change that if we have a lot of questions or if the argument becomes repetitive. Please remember to speak loudly. Our microphones do not amplify, but merely record what is being said. Also, please understand that we have read the briefs and are familiar with the facts of the case, so please devote your time to your strongest arguments. Ms. Borland. May it please the Court, as this Court is aware, we have raised four issues in the brief. Today, I would like to highlight some of the most egregious errors committed by the state in this case, including the state's use of other crimes evidence to portray Mr. Hensley as having a violent character and a propensity toward gun violence, the state's deliberate misrepresentation in closing that one of its own witnesses was so afraid of Mr. Hensley that it had to be arrested to come to court to testify against him, and the misstatement of the law in closing that the prior inconsistent statements of its witnesses did not count as evidence. In this credibility case, these errors undermine confidence in the outcome of the jury's verdict, and therefore we would ask that this Court grant Mr. Hensley a new trial. Regarding our first issue, the state grossly abused the trial court's ruling, allowing the state limited use of Mr. Hensley's prior uses of a gun on the date of the charged offense. While there were certain events that the trial court did allow to come in, defense counsel did successfully secure a promise from the state not to present evidence that when Bernard Norvell, one of the state's key witnesses, had first met Mr. Hensley that day, come over to Mr. Hensley's house, Mr. Hensley had walked up to his car and pointed a gun at him in a threatening manner. Defense counsel had argued that this evidence, while having nothing to do with the actual charged events, kind of portrayed Hensley, I'll quote him, in a cavalier attitude that paints him as a killer and a dangerous person. After the defense counsel made this remark, the state promised it would not introduce that evidence unless Mr. Norvell recanted his prior statements against Mr. Hensley at trial and shifted it in a manner. And that way the state argued it would be relevant to potentially show that he was afraid of Mr. Hensley. Counsel, are you seeing people versus Bedoya to support your argument here? Yes. And isn't the circumstance in that case much different than what we have here? As far as the reason why the other crimes evidence came in, that is different. Our main purpose in pointing to that is the state's use of the evidence in closing argument. For example, in that case where it was a gunfight inside a bar, or not a gunfight, but a murder inside a bar, the state presented evidence of these prior shootings that had occurred throughout the neighborhood. And then in closing, the state said, what do these show? They showed the defendant was out shooting his gun all night, he was like a ticking time bomb waiting to go off, and he was having fun out there. This is the same manner in which the state used the evidence here. What they did was they showed that Mr. Hensley was the kind of guy who used his gun in any circumstance. If you look at the first event that came in involving the fight between Mr. Hensley's brother and Darius Henry at a dice game, the state had presented that evidence kind of to show the circumstances of the event, but in closing they start noting how you jurors know that in basketball games and dice games it's not uncommon for words to be exchanged and elbows to be exchanged. But when Mr. Hensley showed up, according to the state, remarkably, it turned into a gunfight. We know that's not evidence, closing argument, correct? That's correct. So what's the standard of review as far as closing argument? In this case, we were arguing that it was ineffective assistance of counsel for defense counsel not to object and that plain error occurred from the prosecutor's arguments and the use of the other crimes. What's the prejudice to defend here? Just continually portraying him as a dangerous person in this credibility case. There's kind of two things, and the first thing I'll point out is generally the state was not content to let its evidence speak for itself. Even assuming that the other crime's evidence came validly in to trial, the jury's task was, does the state's theory make sense? And perhaps there was a risk, you know, when you're hearing that there's been this ongoing shootout all day and then the state is saying, perhaps the jury would think that, maybe perhaps the state was afraid that the jury would think that it was understandable that he committed this shooting, so the state sort of turned in what was generally just evidence of this ongoing fight into this sort of deal where Mr. Hensley masterminded all of those prior events and showed him dangerous. And in this case there was... Would that be a reasonable inference from the evidence, do you think, that argument in closing? Not the way that they twisted, in the way that they repeatedly said he's happy and gleeful when he fires his guns, he's a dangerous person. And more specifically to the facts of this case, there was no physical evidence which tied Mr. Hensley to this crime. He made no statement. It depended entirely on the credibility of the state's witnesses. They were all four convicted felons. And the two main witnesses, Bernard Norvell and James Davis, who Norvell actually accused Mr. Hensley of committing this offense while being questioned himself, they were specifically also... The jury was specifically instructed to view their testimony with caution because of the fact that they claimed to be present but were innocent. So when you're portraying Mr. Hensley as uniquely dangerous amongst this gang of criminals, it gives their testimony kind of more credibility in that regard. And in considering exactly what the state said, kind of similar to Bedoya, like we said, the state pretty much showed he used his gun in any circumstance. He used the gun at the dice game. The state pointed out how when DeLorean, Stanley, and the others came to shoot at him, while they had gained permission to introduce that evidence, arguing that it would not be that prejudicial because the jury would not be horrified to learn that he acted in self-defense, the state immediately argued in closing, when Mr. Stanley comes up and starts shooting at him, everyone else runs away, but Carlos Hensley stands there saying, I see you, I see you, talks about how it's a crazy, twisted game of hide-and-seek to him. They talk about how his threat in pointing a gun at Mr. Norvell,  they were using it directly to show that he was a bad person capable of committing this offense with a propensity toward gun violence. And again, while the state had promised not to admit that particular evidence at trial, the state actually had Mr. Norvell stand up and demonstrate to the jury how Mr. Hensley had appeared in that circumstance. They elicited that evidence from another witness, who testified that he could not even tell that would be James Davis, well before Norvell testified and well before they knew he could recant. And Mr. Davis said when he saw that event, he could not even tell what type of gun Mr. Hensley was holding. So they had lost any relevance that they had sought to offer at this point and were just kind of portraying Mr. Hensley as dangerous. One final example that I would point out, when discussing the events at the dice game, the state noted how, in closing, how it wished that Mr. Henry would have called the police when Mr. Hensley pointed a gun in his face at that time, because then it could have stopped the events from occurring. Interestingly, if you take a close look at Mr. Henry's testimony, what he said was he was in this fight with Mr. Hensley's brother, they were standing up against a garage, and Mr. Hensley did up his gun, but he was pointing it at the ground. He never pointed it, Mr. Henry never said Mr. Hensley pointed it in his face. So you had the state even exaggerating the testimony of its witnesses to portray Mr. Hensley as this uniquely dangerous, violent person who the state succinctly argued in closing was exactly the kind of guy who could commit this offense. But why isn't all this part of the narrative leading up to the crime therefore admissible? This is all happening within a few minutes, right? It was, I think, several hours over the course of, yeah. Well, our main argument is with the way that the state used the evidence to kind of ask the jury to make inferences about Mr. Hensley. But for every piece of evidence, while it could be relevant to explain the narrative of the crime, it comes into the balancing test. So when you look at the state's theory is he shot at Stanley's car because of this ongoing fight between them. It's very probative to show that Mr. Stanley had come to his house and started firing at him. It becomes a little, while it is also probative to say that perhaps he'd fire back just to give the jury the picture of events, it's also very prejudicial. So when you weigh these together, that's our argument on why it was not admissible. The state did not need to present that evidence. It's kind of similar to the Lindgren case that we've cited, which is an Illinois Supreme Court case. There was evidence that the defendant was charged with committing a murder against his girlfriend's grandfather. And then there was also evidence that after that murder, he and his girlfriend went to his ex-wife's house and set the house on fire. The state introduced it for time and place proximity, and the court found that it was relevant for that purpose, but then found that its prejudice so exceeded it, and since the state could establish time and proximity through other manners, they didn't need to present it in that way. So it's our argument here that while it did bear some relevance, it was not necessary to come in, and particularly because of the manner in which it prejudiced Mr. Hensley, and particularly given the way the state used it, specifically arguing, like I've said before trial, that it would not horrify the jury because it showed self-defense, but then arguing instead to the jury that it showed he was playing a twisted, crazy game of hide-and-seek. Its prejudice outweighed its relevance. Counsel, is your argument based mostly on plain error, or the actions of counsel? Both. Defense counsel? Yeah. It's both, because certainly before trial, defense counsel objected to the evidence coming in, and so that was fully litigated. So there's to an extent when the evidence came in at trial, his objections would have been futile at that point, but specifically when he didn't object when the state presented evidence that it had promised it would not present, and then did not object in closing arguments, that was ineffective. And perhaps if defense counsel had made his objections, the state would not have continued as far as it did. Do you think the evidence was close here? I think it was very close. Just because there was no, I mean, there were IDs. The driver certainly ID'd him and other people. Yeah, and I think I've already touched upon the fact that the case  and why you would view Norvell and Davis's testimony with caution. I think the driver's ID was probably very compelling to the jury, which actually is a great point to talk about another error, because he was not a suspect himself. He was instead a victim, and he had lost his fiancee. He testified initially, or he didn't testify. Well, he did testify at trial that he saw the shooter only come up behind him in a rearview mirror for a few seconds at 1130 at night, and then immediately after the shot was fired, he ducked. His very first statement to several detectives, and then also to his parents and to the parents of Kiana Green, was that he had no idea who the shooter or shooters were. Well, did he say he had no idea? Were those his exact words? It was to the detective who the defense presented. I can't recall his name at this time. And did he explain that by saying, I wanted to kill the guy myself, that's why I didn't tell the police? At trial, he did say that. However, that's an interesting, there were problems with that explanation, because if you take a look at what he was telling the police, he told Detective Colvin that what he could say, he wasn't totally non-forthcoming. He said, I can tell you that I switched cars with someone that night, and I can tell you he was my buddy. I don't know his name, but he lives on Carlos' block. So in fact, he was actually talking about Carlos Hensley that night. He was steering the police to try to help them find information by mentioning his name, which is inconsistent with his later testimony at trial that he was kind of withholding. And that's why I think it was really important for the jury to consider his prior inconsistent statement, which in our second argument, we've noted the prosecutor also misstated the law in telling the jury that prior inconsistent statements don't count as evidence. What they are to consider is what the testimony of the witnesses told them in court. And they specifically highlighted the general instruction that it's giving to the jury that says, take a close look at this. The evidence you consider consists of testimony of the witnesses, exhibits and stipulations that the court has received. The evidence you are supposed to consider consists only of the testimony of the witnesses. She said, that means we're not here to talk about who said what to the police at what time. It's what Christopher Smith told you, she said. So she's highlighting his in-court importance. And when you consider this alongside of all the other errors, it's like the state's not giving defense counsel access to or it's undermining the importance of that evidence. Continuing to note how kind of prosecutors' misstatements in this case, the prosecutor also told the jury that Darius Henry was really compelling in a certain way, Darius Henry being one of the witnesses who explained the other crimes events in this case. The state noted that he had to be arrested in order to come to court to testify against him, against Hensley, which the state said showed his view of Mr. Hensley. And this is the witness who was under investigation for another crime, right? Yes. What in the record affirmatively demonstrates that he knew he was under investigation for the other crime? The best specific evidence we have is just that morning when the parties had been debating whether defense counsel could have the police reports or not. The state had said, defense counsel wanted to question him about his hopes in testifying in this case. And the state said, well, I can tell you that I talked to him this morning and there's been no deals or promises made. I specifically told him we won't be discussing any cases, we won't be discussing that case. And then the prosecutor had also said on several occasions. But that's basically through the mouth of someone who's not even his attorney, right? That's true. Yes. The prosecutor had also said on several occasions before that while he had come to court each time he was subpoenaed prior, it was as soon as the police began to look for him that he fled the scene. And she said upon her own information and belief, he was not coming to court because he wanted to avoid talking to the police. But you make a big point that his testimony was false. Yes. But we need to know, because that requires us to read his mind. Well, I... That's why he asked whether the record shows he knew he was under investigation. It would be the main conversation with the prosecutor specifically. If you combine that with the evidence that he fled the scene and the prosecutor specifically told him that morning she would not be discussing that case with him. I mean, he would obviously wonder what case he was talking about. Did this witness show up in court in shackles? He did. And in cuffs. He was in handcuffs. I'm not absolutely positive of shackles, but he was definitely in handcuffs. That was for the failure to appear warrant, yeah. In this case? Yes. Okay. I mean, the jury must have thought something about that. I mean, it's odd, isn't it? Yeah. And that's why we're arguing that even if Mr. Henry did not know he was under investigation, since the prosecutor did and stated time and time again that it was her information and belief he stopped coming to court because of this murder investigation, when she told the jury in closing that him coming to court and she didn't specifically say in handcuffs, but that he had to be arrested to come to court to testify against Henry spoke about his fear of Mr. Hensley. That was a deliberate misrepresentation, no matter what Henry said. But I also think the state did have a duty to correct the testimony, particularly in light of the fact that defense counsel did not have the police reports themselves, so could not prove when he said that he'd never heard about the murder investigation, that that was incorrect. Let me, before you start running out of time in about three minutes, ask you about the autopsy issue. Oh, sure. Your brief was filed about a year and a half ago, and things have evolved on this issue. Isn't this issue resolved by People v. Leach? I think Leach actually leaves an exception for this case, because our specific issue is defense counsel could not properly cross-examine the surrogate medical examiner about this finding of pseudo-stippling that he made. So Leach says, well, autopsies are generally business records. It also held that the appellate court had erred in holding that business records were never testimonial hearsay. So here, when you had Dr. Humillier, the examiner who viewed Ms. Green's body, come up with a finding of stippling, if you look at what the five justices held in Williams, the Supreme Court justices held in Williams as testimonial hearsay, they say even in the report when someone makes a statement that explains past events which are potentially relevant for future criminal prosecution, they are giving testimonial hearsay. So here, as Leach pointed out, when coroners make a finding of homicide, they know by statute they have to give that to the police. So when Dr. Humillier made a finding in his report of close-range firing, something objective, and he knew that was going to the police, or stippling, which is suggestive of close-range firing, we're arguing that is testimonial hearsay, and that's not covered by Leach, because Leach doesn't say what happens when the surrogate medical examiner has a different opinion. But couldn't the surrogate, you know, even though the surrogate doesn't have the benefit of examining the actual corpse, they can look at photographs, and some of them can be very detailed, and say, yes, that's a gunshot wound. But defense counsel can't say, but he can't prove that the original medical examiner may have looked for embedded glass in the forehead and thus may have been able to eliminate the pseudo-stippling thing. So defense counsel lacks the ability to confront the witness that he would otherwise have. Thank you, Your Honors. Any other questions? No. Thank you, Ms. Borland. Mr. Walters. May it please the Court. With respect to the other crimes evidence, as we stated in our brief, this evidence comes in mainly through the continuing narrative of events doctrine. And the prior uses of the gun are all highly relevant in this case in any event. The fact that defendants displayed the gun to Bernard Norvell is highly important in this case. Defendants stood here and made a statement that there's no physical evidence to link defendant to this crime, and it's not true. The ballistics evidence does link defendant to this crime. He was carrying a .357 Magnum. That's what he pointed at Darius or pointed supposedly at the ground but then told Darius Henry, go get your gun. That's what he pointed at Bernard Norvell. And Bernard Norvell, because that gun was pointed at him, was able to make an identification of that gun as a .357 Magnum revolver. The ammunition that was used to kill Keanu Green and to injure Christopher Smith in this case was consistent with being fired from a .357 revolver. And it was from a revolver, by the way, and not from an automatic weapon like a 9mm because there's no shell casings left at the seams. These were bullet fragments and bullets that were recovered in this case. There were no shell casings recovered. So it's not an automatic weapon. It's a weapon that could only be fired from a .357 Magnum revolver or a .38 Special, only those two revolvers. It could not be fired by any other gun. Counsel, your opponent says this was a close case as far as the evidence. There are three eyewitnesses in this case. In addition, there is ballistics evidence that links this defendant to this crime. In other cases that I've cited to this court, the evidence of two eyewitnesses plus some other evidence was considered overwhelming evidence. So there's no way under the law that, really, this case could be considered anything less than overwhelming evidence in this case. And again, it is untrue to say that there's no physical evidence linking the defendant to the crime. I want to briefly address, the defendant says that there was a promise made by the prosecutor. The prosecutor made a representation early on in the pretrial proceedings as to how she expected this evidence to be used. I would point out that the trial judge at that time withheld ruling. So it's not as if this was a violation of some kind of a motion in limine at that point. I would also point out that at the time of trial, when the prosecutor understood the full value of this evidence, that being defendants displaying the gun to Bernard Gravel, so that Bernard Gravel could identify this weapon that linked the defendant to the crime, defense counsel didn't object. And I think that's strongly suggestive of two things, and neither of them is ineffective assistance of counsel. Number one is, I've already explained, this was highly probative evidence. But number two, the fact that highly experienced defense counsel, Mike Mayfield, represented one of the defendants in the Brown's Chicken case, didn't object in this case. The fact that there was a period of time that transpired between what was said originally and the trial in this case is highly suggestive that there was some sort of informal conference of the parties as to how this evidence was going to be used in this case. And in any event, as I said, defense counsel did not object. So the only way that this issue could be analyzed is under the plain error rule. And as I've said, the evidence in this case is not closely balanced. Counsel, what about the closing argument that your opponent seems to think was a really terrible thing? And can you go through what comments were made relative to the closing? Yeah, particularly the underworld comment. The underworld comment needs to be looked at in terms of both what defense counsel argued in this case and what the facts of this case are. In the facts of this case, it wasn't simply an us versus them. Almost every witness in this case, including the defendant, came from this milieu of, instead of taking a problem, alternative dispute resolution, instead of solving their problems by going to authorities, almost everyone in this case was looking for some form of retaliation, retaliation with a gun. And that is true of our witnesses, too. That is true. And so the prosecutor was entitled to respond to that situation and point out fairly that, for instance, with Christopher Smith, his initial reaction to this case was to having his girlfriend shot and to him being shot and severely injured in this case was to seek revenge. That was his initial response. It's disappointing, but it is on another level sort of understandable human reaction. But it's disappointing that he didn't do the right thing initially. But the fact of the matter is that his mother talked sense into him and that he did do the right thing, and that the jury was entitled to consider that in terms of his credibility, that ultimately he made a choice to do the right thing, to cooperate with the authorities, to see justice pursued through the criminal justice system and not on the streets with a gun, which is what the defendant did in this case, but also which some other people, some of our other witnesses did in this case. So it's a fair comment on the evidence that these witnesses came from this milieu where problems are solved with using a gun, by retaliation of gunfire. So was the term fear of Hensley used in the closing? It's not used at all, actually. If you look at M83 and 84, you look at the particular argument that the defendant is referring to, if you look at those pages, the prosecutor in this case did not use the word fear. And she made essentially two different arguments. She said that Darius Henry was compelling because he had to be brought in to testify, he had to be arrested to testify. Well, keep in mind, what did defense counsel argue in this case? Defense counsel argued that Darius Henry had a motive to curry favor with the prosecution after all. He was brought in in handcuffs and shackles. He had several pending cases against him. So defense counsel's argument was that he had a motive to curry favor with the prosecution. Our counter to that, and a fair counter argument to that is, well, if that was true, why didn't he voluntarily come to court? Why didn't he voluntarily cooperate with us? The fact that he had to be brought in against his will to testify in this case undermines fairly the argument that Darius Henry just came here to get a deal from the prosecution. That was the argument that defense counsel raised. We're entitled to respond to arguments raised by defense counsel. This was a fair comment both on the evidence in the record and in response to defense counsel's argument. How about the happy and gleeful terms? Well, keep in mind in this case, first of all, that defendant's conduct, defendant's conduct in that shootout on Blackstone Street, his conduct in all three of these instances, but his conduct in that shootout on Blackstone Street is highly relevant evidence. Prior attempts to kill the same target, if you have an attempt murder case and you have prior attempts to kill the same victim in the past, that is the most highly probative evidence that you can possibly have as to intent, specific intent to kill that individual. And that's what we have here. We have the defendant in this case standing and firing at DeLorean Stanley. This was after he challenged Darius Henry to a duel. I mean, there's an argument here that this was just plain self-defense. But keep in mind that defense counsel says that defendant just had his gun pointed in the ground. But his words to Darius Henry were, go get your gun. And I submit to you that in the parlance of 93rd and Blackstone, that's, I challenge you, sir. I submit to you that that is exactly the same thing. He was challenging Darius Henry to go get his gun and go have a shootout, which is exactly what happened. So to argue that this is self-defense, I think maybe at one point in time it may have looked that way. But if you look at all the evidence that was submitted at trial, it's pretty clear that this is not simply self-defense. And that defendant shooting at a point when everyone else is fleeing the scene, all the witnesses talk about everyone else is fleeing the scene, defendant engages in a minute and a half gun battle. Now, his adversaries in this gun battle, they're the ones that eventually back down. Defendant in this case, even after this gun battle, is heard to be looking, hollering out for more ammunition. He clearly wants to carry on this fight. So this evidence, his conduct, his willingness to, his unwillingness to back down from this fight, his willingness to engage in deadly combat with these people, including DeLorean Stanley, the very person whose car he's going to be firing into, this is highly probative evidence that demonstrates that he is indeed the person who's standing outside that car, DeLorean Stanley's car, firing five to six shots into it. So his conduct, his conduct, his attitude, his battle stance during this fight is very, very highly probative. And the fact of the matter is that he's shouting out things like, I see you. And the fact of the matter is that even after the shooting, he says, did you see that, I don't want to use the word, but that N-word, did you see that N-word head bob up and down or side to side, whatever it was, after he shot Keanu Green? He said those things. The jury was entitled to consider what he said at the time that he did these acts, his bragging about what he had just done. And the jury was entitled to a fair account of, and the prosecutor was entitled to make fair comments based on those things that happened and those things that were said by the defendant. Defendant is only himself to blame. He said those things. With respect to the argument that, I think I've already handled the alleged misrepresentation that Darius Henry was brought in to testify out of fear. The prosecutor does go on to make comments relating to Darius Henry's demeanor on the witness stand. And there was sort of a belabored attempt at an eventual in-court identification. But if you look at the record of Darius Henry's in-court identification, something's going on there. It's hard exactly to tell from the cold record what exactly it was, but it's pretty drawn out and unusual. The judge actually had him step off the witness stand and point out the defendant in this case. The prosecutor is entitled to make fair comments about the demeanor and the credibility and the conduct of a witness on the stand. So any sort of whiff or intimation about his demeanor was absolutely fair game. That's well-settled law. With respect to the alleged claim that there's a prior misstatement regarding a jury instruction, you know, I think about we're in the anniversary of World War I. The war that preceded World War I was the Franco-Prussian War. And that was started by Otto von Bismarck selectively quoting what the exchange between the French ambassador and the Prussian king. And that led to a war. By selectively quoting what happened, a war was caused. And the Supreme Court admonishes reviewing courts to look at closing arguments in their entirety and not just snippets. And I submit to you that the defendant's entire argument in that particular situation is based on a snippet. It's based on MMM 63 to 64. And if you just stop where the defendant tells you to stop at MMM 64, then maybe it looks like the prosecutor is actually telling the jury that, oh, under your jury instruction you're not to consider prior inconsistent statements. But if you look at the record, that argument that the prosecutor is making actually carries on all the way to MMM 68. And you know that because there's verbal bookends to that argument. The prosecutor starts off by saying, boy, if that's their argument, this whole argument about whether he came out of the backseat or not, if that's their whole argument, I can dispel it. If the case doesn't rise or fall on that, I can dispel that in 10 seconds. That's where that section of argument, this particular argument, starts. On MMM 68, we see that argument come to its conclusion, because the prosecutor then finishes up by saying, the case doesn't rise or fall on this particular point. So what happens between MMM 64 and MMM 68? The prosecutor talks about prior inconsistent statements, prior out-of-court statements. So it's illogical to say that the prosecutor was saying that you can't consider prior out-of-court statements. When the prosecutor then went through and talked about the prior out-of-court statements. And the fact of the matter is that on MMM 68, when the prosecutor is wrapping up this section, she says, the reason you shouldn't consider Christopher Smith's prior lies is because, A, he admitted that he was lying, but B, a witness doesn't remember their lies. People don't remember their lies. They get caught in trying to remember their lies. He remembered the truth of what happened. And that's why you should consider his in-court testimony, as opposed to his prior out-of-court statements to the police, because those prior out-of-court statements were not credible. They were lies. That's what she says. She doesn't say you can't consider prior inconsistent statements. I would point out, too, that the jury was instructed immediately afterward that they were not to single out one instruction over another. That's on MMM 90, I believe. And they were also properly instructed on the use of prior inconsistent statements per 11510. So the jury received proper instruction in this case. They were not misled in any way. Just to remind me, in the cross-examination of that witness in shackles and in cuffs, was there any testimony relative about his criminal activity or his convictions on cross by the public defender? My recollection is that somehow this stuff came out. I can't remember if it came out on direct or on cross. But he had been arrested in Wisconsin. He had a couple offenses. It's in my state of the fact, so I know it came out in the record somehow. I just can't remember whether that was. I thought it was in the record, but I wasn't sure. There was some other testimony relative to his prior. Right. No, it was definitely in the record. I just can't, you know, I'd have to go back and look at my brief. But I know that's in the record. Just quickly, I just want to address something that Justice Lord, actually two things that you brought up. You were asking about whether there's any evidence to refute Darius Henry's testimony that he himself personally was not aware that he was a suspect in this case. It is beyond argument that there was not. There's no evidence. The parties in this case submitted under seal the police reports regarding that other investigation. And I'm not suggesting that we talk about all the other facts, because that is a pending investigation. But this Court is entitled to review those documents. And those documents absolutely demonstrate that the police themselves had not talked to Darius Henry. The police hadn't talked to him. And our office, the felony review state's attorney, who was charged with investigating this case, with approving charges in this case, had indicated to the police that nothing was going to happen on this case until we talked or the police talked to Darius Henry. So at the time that the trial prosecutor in this case, who is not charged with prosecuting Darius Henry in that other case, at the time that she makes a couple of statements about believing, statements about belief as to where Darius Henry was or why he was not in court, she had not talked to Darius Henry. Darius Henry was out of state. He was in Wisconsin or Minnesota. She hadn't talked to him. Those statements of belief are based on an assumption. So what's the question? Do you know if you're under investigation, or have you talked to the police and state's attorney about your being under investigation? I recall. What was the question that was asked? Do you recall? I know his answer. I'm trying to think if I wrote it here in my notes. No, no, no. It is an important point. I think he was asked whether he was a suspect in this other unconnected murder investigation. And his answer was, not that I'm aware of. And in order to prove any sort of claim of knowing use of false testimony, the defendant would have to prove that there was, in fact, false testimony in this case. And there's no evidence, there's no way to prove that Darius Henry was testifying falsely when he said he wasn't aware of it. The fact that the prosecutor had some sort of conversation where she immediately told him, we're not talking about anything else except for this case, doesn't prove anything. It doesn't establish that there was false testimony in this case. The other thing that you mentioned was the Leach issue with respect to Issue 3 in this case. It's our position that Leach is binding, that the use of a, especially an autopsy report by a Cook County medical examiner, is a business record. It's non-testimonial, and therefore we're outside of the box of Crawford. Look at the Ebola situation. Our medical examiners are called to examine everybody that comes in, whether it's from heat stress, from a heat wave, from Ebola, from a death on the street, a murder case. They're called to, they are servants of public health, is what they are, and how they were termed in Leach. And so in this particular case, as in cases involving our Cook County medical examiner's office, these are business records. These are not testimonial. We are not within the realm of Crawford with respect to that testimony. Unless there are any other questions, the people of the State of Illinois respectfully request that this Court affirm defendant's conviction for the murder of Kiana Green and the attempt murder of Christopher Smith. Thank you, Counsel. Ms. Borland. Thank you, Your Honors. I have a few points. First, discussing all of this testimony about Norvell, at the very outset, the prosecutor's promise avoided the court's adverse ruling on the issue. So it's our opinion that she sort of usurped the position of the court in that regard. And particularly, where the state is arguing that this is relevant to show what type of gun he was holding, what the state actually said and what defense counsel agreed to was, we'll still establish that he saw the gun when he came to the house. We just won't show that he used the gun in a threatening manner. And again, I reiterate, even before Norvell testified, they asked Davis about this incident involving the threat, and Davis said he could not even see what type of gun Mr. Hensley was holding at that time. And regarding Darius Henry, I do have the exact quotes here. Defense counsel's first question was, you are under investigation or the subject of a murder investigation here in Chicago, aren't you? He said, not that I know of. Defense counsel followed up, you didn't hear anything about that. And he said, no, sir. The prosecutor had specifically said, it's upon information and belief in talking to detectives that he fled the state because he was avoiding being questioned by the detectives, by the police at all. So you didn't hear anything about that is inconsistent with what the prosecutor had said to the court. And her testimony, not her testimony, but her statements before trial, I said we wouldn't be discussing any case. I said we wouldn't be discussing that case. It does tend to imply that they were talking about the murder conviction. Well, the fact that the detectives knew, does that infer that he knew, that the witness knew? I think, well, the fact that she said he was running to be avoided question by the police, that's kind of what shows that. And in addition, her statement with him that we won't be discussing anything. And regarding her statement in closing, as the state pointed out, it was immediately followed by this conduct that had happened regarding him not appearing in court to testify. The prosecutor immediately said, while saying he was really compelling in a certain way, you saw how he always had to refer to the defendant as Mr. Hensley. That's not true, as we've pointed out in the briefs. On 14 occasions he called him Carlos. The only time he said Mr. Hensley was when it was in one time he said Carlos, the defendant Mr. Hensley. And in another instance, after the prosecutor had said, you understand when I'm referring to the defendant I'm talking about Carlos Hensley. And regarding the identification, he actually was pointing, the prosecutor asked him as soon as he got on the stand, do you see the defendant in court? And he said yes, he's sitting over there at council table. There was some discussion about the fact that he was wearing a plaid shirt and he couldn't say what the colors were. So the trial court did ask him to go over and look at those colors. So when the prosecutor, although she never said fear, he just said that speaks volumes about his fear of the defendant. So it was certainly implied. And regarding the comments about the underworld, I would just say that this kind of talking about how this was a case about the underworld crashing with the real world where Kiana Green and the jurors lived, that sort of preyed on the jurors' fears in and of itself. And it also further bolstered the credibility of the state's witnesses. The prosecutor used this in rebuttal at least, although it was used in opening closing statement as well, to say it was wrong for defense counsel to call them liars because they had come so far to court to bring justice against someone who lived in the jury's world. This sort of, when the jury was supposed to consider their criminal history and considering their credibility, telling the jurors to instead consider how far they had come kind of undermined what the jury was to consider. And telling them that rejecting these witnesses would be a disservice to Kiana Green, who lived in their world and who had finally brought them to court, implied that if they don't convict Mr. Hensley, these witnesses won't testify to protect citizens that live in the jury's world again. So in context of this case, where Mr. Hensley was continually pointed out amongst the gang of criminals who testified against him as uniquely dangerous, and where the state did misstate the law, regardless of what they later said about credibility,  that they should focus on this instruction that said they should consider only the testimony in court and only the exhibits and stipulations. It did misstate the law. And where the defense counsel was not given a chance to test the only objective evidence in this case. Clearly all these errors work together. Where the true task of the jury in this case was not overwhelming. It was are these witnesses telling them the truth. The Supreme Court repeatedly says, in cases where it boils down to credibility, we don't let errors go away harmless. We consider them greater. This was truly one of those cases. The jury needed to determine whether the witnesses were telling the truth. And these errors work together to deny Mr. Hensley a fair trial. Thank you. Any other questions? All right. Thank you, counsel. The court will take the matter under advisement. And court stands in recess.